Filed 9/25/25  Marriage of Wilson CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of MARY S. JONES WILSON and MICHAEL A. WILSON. | B329777 |
| | (Los Angeles County Super. Ct. No. BD530826) |
| MARY S. JONES WILSON, Respondent, v. WENDY L. SHEINKOPF, Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Bradley S. Phillips, Judge.  Affirmed.

Wendy L. Sheinkopf, in pro. per., for Appellant.

Sall Spencer Callas & Krueger, Suzanne Burke Spencer, Michael A. Sall; Devan Beck Law Group and Devan Beck for Respondent.

Claimant and appellant Wendy Sheinkopf (Sheinkopf) represented Michael Wilson (Michael) in the dissolution of his marriage to Mary Jones Wilson (Mary).  In this appeal from the family court's ruling expunging Sheinkopf's family law attorney's real property lien (FLARPL),[1] we consider whether the family court erred in determining the promissory note giving rise to the lien had been satisfied.

## I.  BACKGROUND[2]
### A.    *The Dissolution Litigation and the Real Property in Question*

Mary and Michael married in 1979.  Mary petitioned for dissolution of the marriage in 2010.  Michael retained Sheinkopf to represent him that same year.

In November 2018, the family court set a trial on property and debt division issues, including ownership of real property located on Sea Level Drive in Malibu, California (the Sea Level

---

[1]    In a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties, any party may "encumber th[at] party's interest in community real property to pay reasonable attorney's fees in order to retain or maintain legal counsel . . . . This encumbrance shall be known as a 'family law attorney's real property lien' and attaches only to the encumbering party's interest in the community real property." (Fam. Code, § 2033, subd. (a).)

[2]    On our own motion, we judicially notice the record in the appeal taken from the marriage dissolution litigation, case number B300609, and the record in a related pending appeal, case number B331239.  (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

property). The parties stipulated the family court would first determine whether the community held an option to buy the Sea Level property.

Mary contended that in 1995 the community acquired from a trust controlled by Michael's parents an option to buy the Sea Level property for one million dollars. In consideration for the option, Mary and Michael would use community funds to build a new home on the property—the cost of which would be credited against the option purchase price. Michael argued the community never possessed such an option and, alternatively, the option had been repudiated.

In June 2019, the family court found the community possessed an exclusive option to purchase the Sea Level property and ordered Mary and Michael to cooperate in exercising the option. This court affirmed that interlocutory judgment in *In re Marriage of Wilson* (Mar. 25, 2021, B300609) [nonpub. opn.].

The community did not immediately acquire title to the Sea Level property. Instead, in a phase two trial, the family court considered "the legal effect of the exercise of the . . . option" on Mary and Michael's claims arising from "a series" of undisclosed transactions involving the Sea Level property that Michael "engineered" during the marriage. Among other things, between 2001 and 2002, Michael purportedly obtained a separate 100 percent interest in the Sea Level property without Mary's knowledge and, in 2004, conveyed a 50 percent interest to the community. Mary contended she was entitled to a 100 percent interest in the Sea Level property as a result of Michael's breach of his fiduciary duty; Michael contended he may be entitled to reimbursement for expenditures, increase in value, and rental income.

The family court determined no further consideration was needed to exercise the Sea Level option because construction costs exceeded one million dollars, Mary's exercise of the option in a June 2019 letter related back to the option's 1995 grant date and nullified the subsequent transfers (as well as Michael's claims for reimbursement), and Michael forfeited his interest in the Sea Level property through the secret transfers and his conduct in the dissolution proceedings.[3]

In March 2022, the family court entered a judgment incorporating its statement of decision on the phase two trial and directing Michael to "cooperate in conveying Sea Level to Mary immediately . . . ." Shortly before entry of that judgment, Michael died.

### B. Evidence Concerning Payment for Sheinkopf's Legal Services

Several months after entry of the phase two judgment, Mary requested an order that would, among other things, expunge deeds of trust Sheinkopf recorded against the Sea Level property in September 2017 and December 2019. Mary and Sheinkopf's positions relevant to this request for an order require discussion of the financial arrangements Michael and Sheinkopf had made.

---

[3]     The family court also determined Mary owed Michael approximately $278,888 for post-separation payments related to the Sea Level property.

4

### 1. *Promissory note, deeds of trust, and letter agreements*

In September 2015, Michael executed a note promising to pay Sheinkopf $300,000, plus 10 percent annual interest, secured by a deed of trust and assignment of rents for the Sea View property. The promissory note provides it is "payable in full, principal and interest upon demand . . . ." The note further provides that "[i]f action be instituted on this note," Michael would "pay such sum as the [c]ourt may adjudge as attorney's fees."

A letter agreement between Sheinkopf and Michael executed the same day states it was "far from inconceivable that [Michael's] debt for [Sheinkopf's] fees and costs could reach the sum of $300,000.00" and explained "[t]he amount chosen for the lien [i.e., the same $300,000] was calculated to pay [Michael's] outstanding fees to date of over $201,000 (not including work in progress) and to provide for the anticipated fees and costs through the preparation and filing of a Final Judgment." The letter cautioned Michael that "the filing and existence of the aforementioned lien d[id] not guarantee a cap on [his] legal fees, nor d[id] it relieve [him] of [his] obligation for payment of [Sheinkopf's] fees as they bec[a]me due. . . . The lien [wa]s merely meant to insure ultimate payment." The letter further recites that "the lien on the Sea Level property affect[ed] the monies [Michael] would receive at the time of sale [of the property]. This lien must be paid first, from [Michael's] portion of any proceeds that [he] would obtain from the sale. Once the lien amount is disbursed to [Sheinkopf's] office, the lien is removed."

Michael signed a deed of trust in August 2017—though the deed was dated September 2015—and the deed was recorded in

5

September 2017.  The deed of trust specifies it is to secure "[p]ayment of the indebtedness evidenced by one promissory note of even date herewith, and any extension or renewal thereof, in the PRINCIPAL SUM OF $300,000 . . . ."  The deed of trust further specifies that it secures funds beyond the $300,000 set forth in the note only "when evidenced by another note (or notes) reciting it so secured."

Sheinkopf recorded a second deed of trust in December 2019; it is also dated September 2015, but this deed reflects it was signed in January 2016.  Sheinkopf and Michael also signed a second letter agreement in November 2019 stating that, "[d]ue to an office collating error" resulting in Michael's signature page being "appended to the wrong document," a deed of trust Michael signed in January 2016 was "not the one that [Sheinkopf] had recorded" in January 2019.   While this recital raises more questions than it answers (Sheinkopf recorded a deed of trust in September 2017 but the record does not include a deed of trust recorded in January 2019), we need not go deeper down the rabbit hole.  Sheinkopf concedes in her opening brief that Michael signed only one promissory note (i.e., the September 2015 note) and that she and Michael never intended to create more than one lien.[4]  This second December 2019 deed of trust also includes the same provisions we have quoted from the deed of trust recorded in September 2017.  We accordingly refer in this opinion to a single FLARPL, though two deeds of trust were recorded.

---

[4]     Her opening brief explains "[t]he second FLARPL came into existence due to a mistaken impression that no valid recording of a FLARPL was then extant."

### 2. *Notice*

Sheinkopf filed a notice of FLARPL in October 2015. In her declaration filed in support of the notice, Sheinkopf stated "[t]he amount of the family law attorney's lien at issue is $300,000."

Sheinkopf's notice also summarized the parties' respective positions with respect to the Sea Level property at the time: Mary claimed the property was 100 percent community property, while Michael claimed a 50 percent separate property interest plus a one-half share of a 50 percent community interest. Sheinkopf also discussed Michael and Mary's plans to encumber the Sea Level property or other real property, in which case "the proceeds available to [Michael] and paid to [Sheinkopf] would, as may be appropriate, depending on the amount of the award [sic] and the outstanding attorney fees and costs then owed by [Michael], . . . be reflected in a diminution of the lien . . . ."

### 3. *Payments*

In May 2016, the family court ordered Mary and Michael to seek a loan in the amount of at least $600,000, secured by a second home they owned, to be split evenly to pay attorney fees. After they secured the loan, Mary requested—and the family court issued—an order requiring them to sell the second home "forthwith for the payment of professional fees and costs." That order required the proceeds from the sale to be "distributed in even amounts between current counsel of record for the parties to address the current balances due at present to each, and to provide sufficient funds to each going forward for trial on the characterization of [the Sea Level property]. Any remaining funds [were to] be deposited into an interest bearing account for

7

the benefit of the parties, with the parties' attorneys as signatories."

The parties' second home was sold in May 2018, and Mary and Michael each received $1,075,950.36 paid to their attorney client trust accounts. Sheinkopf issued an invoice to Michael on June 1, 2018, reflecting that all outstanding fees—totaling more than $700,000—had been paid from these funds.[5]

### C.     Expungement Orders

In August 2022—after the phase two trial—Mary filed a request for an order expunging or modifying the FLARPL. Mary argued the promissory note had been satisfied and, alternatively, the FLARPL was extinguished by her exercise of the option to purchase the Sea Level property.

Sheinkopf argued in opposition that Michael died owing her an additional $516,693.52 in attorney fees and Mary's exercise of the option did not extinguish subsequent transfers because the purchase had not been consummated and because Mary took title to Michael's share of the community interest in the Sea Level property when he died (and not by virtue of the option).[6]

On March 20, 2023, the family court issued an order granting Mary's request to expunge the FLARPL for two independent reasons: (1) because the promissory note had been paid in full and (2) because Mary's exercise of the option

---

[5]     Indeed, Michael had a "Remaining Retainer Balance" of several hundred thousand dollars after these fees were paid.

[6]     Around the same time, Sheinkopf filed a complaint in intervention seeking a declaration that the FLARPL was valid and enforceable.

8

extinguished deeds of trust issued after the option grant date. The family court ordered Sheinkopf "to cooperate and provide all requested documents to complete the expungement and removal of her deeds of trust . . . ." The family court also issued a separate order the same day, which provided that if Sheinkopf successfully challenged the validity of the expungement order on appeal, there was in any event "good cause to limit the total amount of the . . . expunged FLARPL[ ] to $300,000."

Sheinkopf moved for a new trial on several grounds, two of which bear mentioning. First, Sheinkopf argued there was insufficient evidence to support the family court's finding that Michael's promissory note had been satisfied from the proceeds of the mortgage and sale of the second home because these "funds ran out just after the end of the first trial in this case, and months before Michael and [Sheinkopf] sought to re-record the [d]eed of [t]rust and there is no requirement that the [n]ote be deemed 'paid' when there was an ongoing contractual obligation between [Sheinkopf] and Michael supporting the debt obligation, and both wished for [Sheinkopf] to remain able financially to maintain her representation of Michael . . . . Moreover, the [n]ote was expressly payable 'upon demand,' and there had been no demand . . . ." Second, Sheinkopf argued the family court erred in concluding Mary's exercise of the option extinguished the FLARPL.

The family court denied Sheinkopf's motion for a new trial. With respect to its earlier finding that the promissory note had been satisfied, the family court explained there was "no dispute [Sheinkopf] had been paid well in excess of the $300,000 provided for in the promissory note" and found unpersuasive Sheinkopf's position that the note was not satisfied because "she had never

9

specifically 'demanded' that payment of the note be made." In the court's view, Sheinkopf's position "that she was free to prevent [Michael] from paying the note indefinitely, such that interest would continue to accrue on his obligation indefinitely without his having any ability to terminate such accrual" was "not a reasonable interpretation of the note," particularly in light of the provision in the deed of trust stating any new secured debt would be reflected in another promissory note. As to whether Mary's exercise of the option terminated the FLARPL, the family court concluded Sheinkopf's argument that only a completed purchase would have this effect lacked merit. Citing *Wachovia Bank v. Lifetime Industries, Inc.* (2006) 145 Cal.App.4th 1039, the family court reasoned that "if an optionee has exercised an option and would be entitled to specific performance of that option, title relates back to the date of the option and intervening interests are extinguished."

Sheinkopf appealed the orders expunging the FLARPL and alternatively limiting it to $300,000 in June 2023. The family court subsequently ordered Sheinkopf to deposit with the clerk documents effecting a substitution of trustee and full reconveyance, and she did. The family court determined that, "the executed reconveyances having been deposited with the clerk pursuant to Code of Civil Procedure section 917.3, the perfecting of the appeal in this matter stay[ed] enforcement of" its order expunging the FLARPL.

D.    *Order Awarding Mary Prevailing Party Attorney Fees*
Mary moved for prevailing party attorney fees against Sheinkopf based on the promissory note's attorney fees provision. Citing Civil Code section 1717, which makes contractual

10

provisions for prevailing party attorney fees reciprocal, Mary argued she was entitled to attorney fees because Sheinkopf sought to enforce the note against her. The family court awarded Mary $133,124.00 in prevailing party attorney fees.[7]

E.      *Order Authorizing Mary to Substitute Bond or Deposit in Lieu of Bond as Security for the FLARPL Pending Appeal*

Mary filed a request for an order "[s]ubstituting [b]ond or [d]eposit in [l]ieu of [b]ond as [s]ecurity for FLARPL [p]ending [a]ppeal." Mary argued she needed to record the reconveyance documents to refinance the Sea Level property.

The family court granted Mary's request, issuing an order authorizing her "to post a bond, or make a deposit with the court in lieu of bond, in the amount of $650,000 . . . as substitute security for the FLARPL[ ]." The family court's order further provides that, "[p]ending resolution of the [a]ppeal, . . . Sheinkopf shall have a lien against the bond, or deposit in lieu of bond, in the amount of her FLARPL[ ]" and, if the expungement orders should be reversed, Sheinkopf will recover an amount determined by the family court on a motion to enforce liability against the bond or deposit. Mary deposited a cashier's check for $650,000 with the clerk of the Superior Court on September 1, 2023.

---

[7]      This was less than Mary requested. The family court based its award on "legacy rates actually charged to [Mary]" and determined a multiplier was not appropriate.

*F.	Appeals*

Sheinkopf noticed this appeal from the March 20, 2023, orders expunging the FLARPL and finding good cause to limit them to a total of $300,000 in the event of an appeal.  She subsequently noticed appeals from the July 27, 2023, order granting Mary prevailing party attorney fees and the August 11, 2023, order authorizing Mary to substitute cash for the reconveyance documents as security for the FLARPLs while Sheinkopf's other appeal was pending.  We dispose of that appeal in a separate opinion issued this same date.[8]

## II.  DISCUSSION

Sheinkopf does not dispute that the proceeds from the sale of the second home were sufficient to pay off the promissory note.  She argues, rather, that the note could not be paid down until she demanded payment.  Nothing in the note, the deeds of trust, or the letter agreements, however, suggests she and Michael intended the note to persist beyond Michael's payment of an amount undisputedly greater than the principal and then-accrued interest.  The trial court was accordingly correct in concluding the note had been satisfied and the FLARPL should be expunged.  Because we shall affirm the family court's order on this basis, as discussed further *post*, we need not address the family court's alternative reasoning that the liens were extinguished by Mary's exercise of the purchase option,

---

[8]	In addition to these appeals, Sheinkopf noticed an appeal from the phase two judgment on Michael's behalf.  Michael's successors in interest declined to pursue the appeal, and it was dismissed.

12

Sheinkopf's contention that Mary is personally liable on the note, or Sheinkopf's further challenge to the family court's order limiting the liens to $300,000 in the event of an appeal.

Sheinkopf frames her challenge to the expungement order as a challenge to the family court's construction of the instruments creating the lien. She does not dispute that, were it legally possible for Michael to pay down the lien in 2018, the funds she received from the sale of the second home were sufficient to do so.[9]

Our task in interpreting a contract is "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) In determining whether the million dollars Sheinkopf received in 2018 satisfied the note, we consider the language of the note, the trust deed, and the first letter agreement. (*Kerivan v. Title Ins. & Trust Co.* (1983) 147 Cal.App.3d 225, 230 ["A note and a deed of trust, although two instruments, form parts of one transaction and must be read and construed together"]; see also Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"]; Com. Code, § 3117 ["Subject to applicable law

---

[9]    Sheinkopf's only challenge to the family court's calculations is a suggestion that the *retainer balance* left in Michael's account after all outstanding fees were paid in 2018 was not sufficient to cover principal and interest accrued at that time. This, however, incorrectly distinguishes between payment of Michael's account and payment of the lien.

13

regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement"].)

Much of Sheinkopf's argument turns on the fact that the first letter agreement states the lien secures both outstanding and anticipated fees. That is not unusual. (Civ. Code, § 2884 ["A lien may be created by contract, to take immediate effect, as security for the performance of obligations not then in existence"].) Without more, however, we do not construe such a lien to secure future obligations regardless of payments made in the interim. (See, e.g., 5 Miller & Starr, Cal. Real Estate (4th ed. 2024) § 13:13 ["When the principal of the original obligation indicated in the trust deed has been reduced by partial payment, in the absence of an agreement that future advances are secured by the trust deed, a further advance that increases the obligation back to its original principal is not secured"; in order to secure re-advances of principal, "the deed of trust should expressly state that it secures additional advances and readvances of principal and continues to secure future advances even if the principal balance has been reduced to zero by the repayment principal"].)

Here, nothing in the first letter agreement, the note, or the trust deed indicates the lien secures future obligations even after payment of principal and interest. To the contrary, the trust deed expressly states that it secures "further sums" as Michael may borrow from Sheinkopf only "when evidenced by another note (or notes) reciting it so secured." Indeed, Sheinkopf

confirmed this understanding in her declaration filed in support of the notice of lien, stating that proceeds from anticipated loans against the Sea Level property or Mary and Michael's second home could result "in a diminution of the lien."

Moreover, Sheinkopf's contrary understanding, which reads the note's "upon demand" provision to mean that it could not be paid down prior to a demand for payment, is inconsistent with settled law on the effect of provisions making contracts payable on demand. Precedent has long held that the limitations period to collect on a promissory note payable on demand runs from the date of execution, regardless of whether there has been an actual demand (*O'Neil v. Magner* (1889) 81 Cal. 631, 633; *Buffington v. Ohmert* (1967) 253 Cal.App.2d 254, 256)—and this would not be true if Sheinkopf were correct that a note could not be paid in the absence of a demand. (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1397 ["a limitations period . . . begins to run when a cause of action has accrued, that is, when the cause '"is complete with all of its elements"'"].)

Against all this, Sheinkopf only points to the letter agreements with Michael. She highlights language in the first letter agreement to the effect that the FLARPL was intended to secure fees and costs through final judgment. Read in conjunction with other provisions contemplating pre-judgment satisfaction (Civ. Code, § 1641 ["The whole of a contract is to be taken together"]), this language underscores the $300,000 principal amount included future obligations. But it does not mean it included obligations incurred after the note was paid down. Sheinkopf also emphasizes the first letter agreement's statement that "[t]he lien is merely meant to insure ultimate payment," but that sentence follows warnings that the lien did

15

not guarantee a cap on Michael's legal fees or "relieve [him] of [his] obligation for payment of [Sheinkopf's] fees as they become due. . . ." In context, then, the reference to "insur[ing] ultimate payment" cannot be read to preclude Michael from paying off the note before incurring additional debt; it simply emphasizes that he might well incur additional debt. Sheinkopf also relies on the second letter agreement and trust deed to argue the note was not satisfied, but as we have already explained, Sheinkopf concedes in this appeal that neither she nor Michael intended "to create a new debt, with a new note."[10]

## DISPOSITION

The trial court's order is affirmed. Mary is awarded costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.                    KIM (D.), J.

---

[10] Any inference that Michael believed it was necessary to re-record the trust deed because the note remained unpaid rests on an assumption, unsupported by anything in the record, that Michael took *any* position on the status of the note in late 2019.